Larry RANEY, Petitioner,

v.

FEDERAL BUREAU OF PRISONS,
Respondent.

Nos. 97–3469, 98–3043.

United States Court of Appeals,
Federal Circuit.

Aug. 11, 2000

Michael J. Schrier, Staff Counsel, American Federation of Government Employees, AFL–CIO, of Washington, DC, argued for petitioner. On the brief was Martin R. Cohen, Assistant General Counsel, AFGE, of Bala Cynwyd, Pennsylvania, for peti-

tioner, and Mark D. Roth, General Counsel.

Harold D. Lester, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. On the brief were David M. Cohen, Director; and Joseph A. Kijewski, Assistant Director; and Kenneth M. Dintzer, Attorney. Of counsel were Salomon Gomez, Trial Attorney, Department of Justice; and Steven R. Simon, Supervisory Attorney Advisor, Federal Bureau of Prisons, Labor Law Branch–West, of Phoenix, Arizona.

Peter B. Broida, of Arlington, Virginia, amicus curiae.

Gregory O'Duden, General Counsel, National Treasury Employees Union, of Washington, DC, for amicus curiae, National Treasury Employees Union. With him on the brief was Barbara A. Atkin, Deputy General Counsel.

Before MAYER, Chief Judge, NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, and DYK, Circuit Judges.*

Opinion for the court filed by Circuit Judge GAJARSA, in which Circuit Judges MICHEL, PLAGER, CLEVENGER, SCHALL, BRYSON, and DYK join. Opinion concurring-in-part and dissenting-in-part filed by Circuit Judge RADER, in which Chief Judge MAYER, Circuit Judge PAULINE NEWMAN, Senior Judge ARCHER, and Circuit Judge LOURIE join.

## DECISION

GAJARSA, Circuit Judge.

Larry Raney appeals from arbitrator Charles B. Blackmar's July 25 and September 24, 1997 decisions denying him market-rate attorney fees as well as overtime pay. Concluding that the outcome of this appeal with respect to attorney fees turns on our precedent in *Devine v. National Treasury Employees Union*, 805 F.2d 384 (Fed.Cir.1986), and *Goodrich v. Department of the Navy*, 733 F.2d 1578 (Fed.Cir.1984), we decided to rehear the appeal en banc so that we could consider the following question: Are litigants who employ union staff counsel barred from receiving market-rate attorney fees when such fees are deposited into a separate fund controlled exclusively by lawyers and the fund is used solely to support litigation on behalf of employees' rights? We believe that the Back Pay Act, 5 U.S.C. § 5596(b) (1994), permits, and ethical considerations do not bar, the award of market-rate fees for work by union attorneys under such circumstances. With regard to the decisions on attorney fees, we therefore vacate the arbitrator's denial of market-rate fees and remand for entry of such market-rate fees. We affirm, however, the arbitrator's denial of overtime pay.

## BACKGROUND

On November 1, 1996, the United States Bureau of Prison's Regional Director sustained certain charges against Mr. Raney and ordered his removal from federal employment. The American Federation of Government Employees ("AFGE"), a nonprofit labor union that represents federal sector employees, filed a timely grievance and invoked arbitration on Mr. Raney's behalf. On behalf of Mr. Raney the AFGE attorneys sought reinstatement with back pay and overtime pay. They also sought attorney fees.

The AFGE attorneys were salaried employees of that union. They represented to the arbitrator that any fees received would be deposited in the union's Legal Representation Fund ("LRF"), which is separate from other union funds, administered only by the AFGE General Counsel, and used solely to support litigation brought on behalf of union members or

---

* *Circuit Judge* LINN did not participate in the vote.

other federal employees to enforce their individual rights. The LRF is not used to support litigation when the union is a defendant.[1] The LRF is financed by recovered attorney fees and costs, as well as donations, and is not supported by any union funds.

After a two-day trial, the arbitrator issued a decision sustaining Mr. Raney's grievance with respect to all charges and ordered the Bureau of Prisons to reinstate him with back pay from his termination date. This decision, however, denied his request for attorney fees and overtime pay.

In a supplemental decision responding to Mr. Raney's request for reconsideration, the arbitrator found that Mr. Raney was "substantially innocent" and that attorney fees were in fact justified under the Back Pay Act. This Act authorizes "reasonable attorney fees" when an agency employee has prevailed and the fees are warranted in the interest of justice. *See* 5 U.S.C. §§ 5596(b)(1)(A)(ii), 7701(g)(1). The arbitrator determined that Mr. Raney had met these statutory requirements. The arbitrator also determined that the number of attorney hours claimed to have been spent in Mr. Raney's proceedings and the proposed hourly market rates for the fees were reasonable.

However, instead of granting the prevailing market rate for the award of reasonable attorney fees, the arbitrator determined that, because Mr. Raney was represented by AFGE staff attorneys, the award should be based only on the cost of providing the legal services. Essentially, the arbitrator granted attorney fees based on the percentage of each attorney's salary that was attributable to the total number of hours worked on Mr. Raney's case. In reaching this conclusion, the arbitrator began by noting that the regional federal circuits were split regarding whether such market-rate fees could be made to a un-

ion's legal representation fund. The arbitrator decided to follow the precedent of our circuit, which precludes an award of market-rate fees for representation by union attorneys in the absence of a separate fund from which no benefit directly or indirectly accrues to the union and such fund is fully and completely supportive of the union's litigation activities. This in essence requires that a "hermetic seal" be established for the fund, even if the fund is separated and controlled exclusively by lawyers and is used solely to support litigation for employee rights. With regard to Mr. Raney's request for overtime pay, the arbitrator affirmed his earlier decision denying overtime pay on the basis that Mr. Raney did not adequately prove that he would have worked overtime hours.

## DISCUSSION

### A. Standard of Review

 We review an arbitrator's decision regarding a back pay award under the same standard as a decision of the Merit Systems Protection Board. *See* 5 U.S.C. § 7121(f); *Dunn v. Department of Veterans Affairs*, 98 F.3d 1308, 1311 (Fed.Cir. 1996). Thus, we must affirm an arbitrator's decision unless it is found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c); *Cheeseman v. OPM*, 791 F.2d 138, 140 (Fed.Cir.1986). Because the question regarding attorney fees in this case turns on whether the arbitrator applied the correct legal standard, our review is plenary. *See King v. Department of the Navy*, 130 F.3d 1031, 1032 (Fed.Cir.1997) ("We review the Board's determinations of law for correctness without deference to the Board's decision.").

---

1. The arbitrator credited the petitioner's description of the LRF, and the government did not challenge it.

## B. Arguments by the Parties

On appeal to this court, Mr. Raney argues that the phrase "reasonable attorney fees" in the Back Pay Act appears in numerous federal fee-shifting statutes and has been uniformly interpreted in those contexts to mean "market-rate fees." Mr. Raney asserts that there is nothing in the plain language of the Back Pay Act or its legislative history that provides for a deviation from this accepted interpretation of the phrase "reasonable attorney fees." The only limitation, argues Mr. Raney, is counsel's ability to accept such fees under ethical considerations set forth in applicable rules of professional conduct. The AFGE attorneys were D.C. Bar members practicing in Washington D.C. As a result, Mr. Raney contends that they should be entitled to market-rate fees, because the D.C. Bar Legal Ethics Committee as well as three of our sister circuits have found that union counsel are not barred by ethical considerations from receiving full market-rate fees when such awards are deposited in a separate fund controlled by attorneys and used only for employee litigation-related expenses. In short, neither the ethics rules in the District of Columbia nor any other circuit law demands the "hermetically sealed" requirement for entitlement to market-rate fees that exists in our precedent. In addition, Mr. Raney submits that the arbitrator erred in denying his request for overtime pay.

The government does not dispute that Mr. Raney is the prevailing party and entitled to attorney fees under the Back Pay Act. Nor does the government dispute that the phrase "reasonable attorney fees" typically means "market-rate fees." The main thrust of the government's position is that payment of market-rate fees into a legal representation fund, such as the LRF, does not cure the ethical prohibitions against fee splitting with non-lawyers and the unauthorized practice of law. The government does not even make the statutory interpretation argument proposed in the dissenting opinion. On the ethical point, according to the government, if "market-rate fees flowed into the litigation fund, this arrangement would—dollar for dollar—relieve the union from costs that the union otherwise would have incurred." In essence, the government is arguing that receipt of market-rate fees into the LRF would relieve the union of otherwise financing the LRF, thereby freeing union funds for other purposes, which is tantamount to fee splitting between the union attorneys and the union. The government argues that such a situation provides the union with an incentive to control the professional conduct of the union attorneys, which is prohibited by applicable rules of ethics. Market-rate fees should only be allowed, according to the government, if the union's legal representation fund is "hermetically sealed," that is, the litigation fund would pay for all of the union's employee-related litigation and no benefit, directly or indirectly, would accrue to the union by the payment of market-rate fees. The government grounds its assertion on our holding in *Devine*. Because the LRF is not "hermetically sealed," the government asserts that we should deny market-rate fees in this case. The government therefore requests that we affirm the arbitrator's award of cost-based attorney fees. With respect to the overtime issue, the government maintains that the arbitrator properly concluded that Mr. Raney had not met his burden of proving the amount of overtime he would have worked had he not been removed.

## C. The Award of Attorney Fees

■ We are faced with the issue of whether the petitioner is entitled to receive market-rate fees for work by union attorneys under the Back Pay Act, when such fees are deposited in a fund controlled exclusively by lawyers to support litigation on behalf of employee rights and the fund is separate from other union funds. As with any question of statutory interpretation, our starting point is with the language of the statute itself. *See*

*Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993).

■ The Back Pay Act provides that:

[a]n employee of an agency who ... [is found] to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee (A) *is entitled,* on correction of the personnel action, *to receive ... reasonable attorney fees* related to the ˙ personnel action which ... shall be awarded in accordance with the standards established under 7701(g) of this title.

5 U.S.C. § 5596(b)(1)(A)(ii) (emphases added). We begin by noting that the text of the statute does not define "reasonable attorney fees." In addition, the plain language does not differentiate between an attorney in private practice and an attorney who is employed by a non-profit legal organization, including one established by a labor union.[2] The text of the Back Pay Act therefore provides no basis for distinguishing between in-house and private firm counsel when calculating or assessing such fees.

Before 1978, when the Back Pay Act was amended, the phrase "reasonable attorney fees" had been used by Congress in numerous federal fee-shifting statutes and had uniformly been interpreted to require the payment of "market-rate" fees. *See Blum v. Stenson,* 465 U.S. 886, 894–96, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). As the Supreme Court noted in *Blum,* "[n]one of the cases decided [before 1976] ... had adopted a cost-based approach to calculating fees. Reference to market rate was uniform." *Id.,* 465 U.S. at 894 n. 10, 104

S.Ct. 1541. The same was true in the period from 1976 to 1978. *See, e.g., Hughes v. Repko,* 578 F.2d 483, 488 n. 7 (3d Cir. 1978); *King v. Greenblatt,* 560 F.2d 1024, 1026 (1st Cir.1977). Congress is presumed to have created the attorney fee provision of the Back Pay Act with this established statutory construction in mind. *See id.* at 894 n. 10, 104 S.Ct. 1541; *Cannon v. University of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (explaining that Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts). Thus, Congress was undoubtedly aware that courts have consistently interpreted "reasonable attorney fees" as the prevailing market-rate fees. *See Hensley v. Eckerhart,* 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In this case, Congress added the "reasonable attorney fees" provision to the Back Pay Act as part of the Civil Service Reform Act of 1978. *See* Pub.L. No. 95–454, Title VII, § 702, 92 Stat. 1111 (1978). A variety of relevant fee shifting statutes was passed in the years prior to this Act with the inclusion of reasonable attorney fees. *See, e.g.,* 42 U.S.C. § 1988 (Civil Rights Act Attorney's Fees Awards Act of 1976); 29 U.S.C § 1132(g) (Employees Retirement Income Security Act of 1974); 5 U.S.C. § 552a(g) (Privacy Act of 1974); 26 U.S.C. § 6110(i) (Tax Reform Act of 1976); 5 U.S.C. § 504 (Equal Access to Justice Act of 1980); *see also Marek v. Chesny,* 473 U.S. 1, 43, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (appendix to Brennan, J., dissenting) (listing approximately 100 federal fee-shifting statutes providing for reasonable attorney fees). Given Congress' knowledge and understanding of the construction of this phrase,

**2.** The dissent differentiates between attorneys in private practice in large firms and attorneys in non-profit firms, and questions the quality of both the product and the personnel behind the union's legal representation efforts. The dissent denigrates the expectations of the union's clients, the quality of its associate attorneys, and the demands the union's

practice places on those associates. It then contrasts these characteristics of the union practice with those of "blue chip" law firms who presumably have "higher" standards. Both the basis for these views and their relevance to the issues at hand lie beyond the understanding of the court.

we hold today that "reasonable attorney fees" in the Back Pay Act means "prevailing market-rate attorney fees."

■ The Supreme Court's instructions in *Blum* are crystal clear that a non-profit legal services organization is entitled to receive a prevailing market rate pursuant to a statute that authorizes the prevailing party to be awarded "a reasonable attorney's fee as part of the cost." 465 U.S. at 894, 104 S.Ct. 1541. The Supreme Court clearly rejected the notion that legal fees for a non-profit legal services organization must be calculated according to cost.[3]

■ Moreover, the Supreme Court made it clear that when a statute authorizes a non-profit legal services organization to receive "reasonable attorney's fees" when it represents the prevailing party, it is in the interest of the public "that such law firms be awarded reasonable attorney's fees to be computed in the traditional manner when its counsel perform legal services otherwise entitling them to the award of attorney's fees." *Id.* at 895, 104 S.Ct. 1541 (citing with approval *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal. 1974) and *Davis v. County of Los Angeles,* 8 EPD ¶ 9444, 1974 WL 180 (C.D.Cal. 1974)). We conclude that, like the legal service organization in *Blum,* the Legal Representation Fund in this case lies among those organizations contemplated by Congress to be entitled to reasonable attorney fees.

The dissenting opinion crafts a rather unique statutory interpretation argument to salvage the government's case. In the

first place, the dissenting opinion interprets "incurred by an employee or applicant." The second piece of the statutory argument is that the Back Pay Act confines market rate fees to cases involving discrimination. On both points, the dissenting opinion is not correct.

The dissent agrees that the language of 5 U.S.C. § 7701(g)(1) must be understood to authorize the payment of fees for legal services provided on behalf of the employee, even if the fee payment is made to a third party such as the union in this case. However, under the dissent's rationale, the authorized "reasonable attorney fees" under the Back Pay Act must mean something different than in *Blum* because in *Blum* the Supreme Court addressed the words "reasonable attorney fees" under the Civil Rights Act. In support of its position the dissent points to the Back Pay Act's references to the "standards ... under section 7701(g)" and to "payment by the agency involved of reasonable attorney fees incurred by an employee or applicant," and emphatically contends that "this language means what it says." Of course, if this language really "means what it says," then there is no reason for the dissent either to add the footnote clarifying the "incurred" language or to append the term "actually" to the language selected by Congress. In fact, both of these "clarifications" are nothing more than rationalizations required to reach a desired conclusion, while avoiding the undeniably irrational result that the employee would receive, under the literal statutory language, no fee award at all.[4]

---

**3.** Both the petitioner and the Solicitor General urged the Supreme Court to adopt a cost-related standard rather than a prevailing market rate in order to limit the "windfall" or "subsidy" that the prevailing market rates would allegedly provide the legal services organization. This position was rejected by the Court. *See Blum,* 465 U.S. at 895, 104 S.Ct. 1541.

**4.** Mr. Raney plainly understood that any fees collected in the litigation over the grievance would go to the union. In that setting, it makes sense to regard the understanding be-

tween the union and the employee as a fee arrangement with the amount of the fee to be determined by the adjudicator and the fee to be paid only in the event of an award. *See Phillips v. General Servs. Admin.,* 924 F.2d 1577, 1582 (Fed.Cir.1991) (construing a contingent fee arrangement to mean that if an award of attorney fees is obtained on the client's behalf "she is obligated to turn it over to her attorney. In this sense, [the client] incurs the fees that may be awarded her."). The adjudicator should be free under such an arrangement to award a reasonable fee, i.e.,

■ The dissent's attempt to restrict "reasonable attorney fees incurred" to "reasonable attorney fees *actually* incurred" constitutes precisely the type of legislative rewrite that any court should avoid. It imposes a limitation which Congress neither expressed nor intended. Congress has passed a variety of statutes that have specifically referred to attorney fees as "incurred," *see, e.g.,* 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act ("FOIA")); 5 U.S.C. § 552a(g) (Privacy Act of 1974); Fed.R.Civ.P. 37(a)(4), but the courts have neither interpreted the "incurred" term in these statutes to restrict or limit the payment of fees to those *actually* incurred, nor prevented market-rate fees from being awarded. For example, in *Jordan v. United States Dep't of Justice,* 691 F.2d 514, 523 (D.C.Cir.1982), the Court of Appeals for the District of Columbia held that fee awards under FOIA must "be measured by the market value of the services rendered, not the amount actually received by the attorney nor the amount that would have been received absent an award of fees," even if the services are provided by unpaid law-student interns. Similarly, in *Textor v. Northern Illinois University,* 711 F.2d 1387 (7th Cir.1983), the Seventh Circuit Court of Appeals considered the term as used in Rule 37(a)(4) of the Federal Rules of Civil Procedure ("reasonable expenses incurred in obtaining the order, including fees"), and held that litigants employing a salaried in-house counsel were just as entitled to market-rate fees under the rule as litigants using hourly-rate attorneys. *See id.* at 1397; *see also Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.,* 76 F.3d 114, 115–16 (7th Cir.1996) (ERISA decision citing *Textor,* noting that "both lawyers and nonlawyers may recover fees at the market rate, whether they obtain legal services by the hour in a spot market or by the year through employment contracts", and criticizing *Devine* and *Goodrich* as "disre-

gard[ing] the principle that the litigant owns the award"); *Crooker v. United States Dep't of the Treasury,* 663 F.2d 140, 141 (D.C.Cir.1980) (rejecting the government's argument that *pro se* prisoner was not entitled to fees under FOIA for his own litigation efforts).

This court also interpreted the term "incurred" in *Wilson v. General Servs. Admin.,* 126 F.3d 1406, 1409 (Fed.Cir.1997), and noted that "courts have awarded attorney fees under EAJA [Equal Access to Justice Act] *and similar fee-shifting statutes* requiring that fees be 'incurred' when the prevailing party is represented by a legal services organization or counsel appearing pro bono" (emphasis added). *Cf. National Ass'n of Criminal Defense Lawyers v. United States Dep't of Justice,* 182 F.3d 981, 987 (D.C.Cir.1999) (FOIA decision dismissing the government's appeal of fee award to non-profit organization and denying petition for writ of mandamus). Clearly then, the fees "incurred" in this case may also be "reasonable" according to the prevailing rates of the market.

There is also a practical objection to using a cost-based method of calculating fees, because trying to determine the "cost" of legal services to the provider can prove elusive, as this case demonstrates. To calculate the "reasonable attorney fees" based on a pro rata allocation of the attorneys' salaries, as the arbitrator did in this case, clearly understates the true cost to the union of the attorneys' services. In addition to their salaries, the union must pay for benefits for the attorneys, support services, equipment, office space, attorney recruitment, attorney training and continuing education, and administrative overhead. Moreover, the cost to the union of devoting the attorneys' time to Mr. Raney's case cannot properly be calculated without taking into account the opportunity cost involved in devoting attorney time to one case when it could be devoted to

the market rate for the services rendered, and to award that fee to the union pursuant to the

express or implied agreement between the union and the employee.

others. Cases that are foregone could well include cases clearly eligible for market-rate fees, such as cases involving claims of unlawful discrimination. Because of the difficulty of calculating "cost" in this setting, the preferable method of valuing attorney fees for particular legal services is the market value of those services. *See Central States,* 76 F.3d at 116.

If the rule were otherwise, attorneys hired on a straight hourly basis would recover their full fee up to the market rate, but attorneys on retainers, attorneys with contingent fees, and attorneys offering services under prepaid legal plans would recover less. This court has not drawn such a distinction under the Equal Access to Justice Act. *See Phillips,* 924 F.2d at 1582 & n. 4. There is no reason to draw such a distinction in cases arising under the attorney fee provisions of the Back Pay Act.

On the second point, the dissenting opinion notes and makes much of the fact that the statute has a separate express provision for awards when discrimination is the basis for the cause of action. That, however, is of no consequence to whether market fees can be awarded under the Back Pay Act. The separate provision for awards in discrimination cases simply broadens the scope of the reasonable attorney fee recovery in those cases to include the fees of experts. No such broadened scope of recovery is at issue in this case.

By providing separate subsections 7701(g)(1) and 7701(g)(2), Congress merely recognized that federal employees terminated due to discrimination are entitled to obtain not only reasonable attorney fees, i.e., market-rate fees, but also expert fees, which costs may be necessary to establish the discriminatory action. *See* 5 U.S.C. § 7701(g)(2). Thus, the dissent misinterprets a complementary redundancy in the subsections, because the amount available

under the one could be greater than the amount available under the other.

■ When Congress amended the Back Pay Act to provide for fee awards more broadly, it sought to eliminate the strong financial disincentives for those who would protect their employment from unjustified governmental action. *See* S. Rep., No. 95–969, at 60 (1978), U.S. Code Cong. & Admin. News at 2723, 2783. In so doing, it sought to deter the unreasonable exercise of governmental authority. *Cf. Ardestani v. INS,* 502 U.S. 129, 138, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991); *Commissioner, INS v. Jean,* 496 U.S. 154, 165 n. 14, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990) ("[A] party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy."). The effect of the dissent's rationale subverts this very purpose.

■ This construction of the operative phrase by the Supreme Court in *Blum,* coupled with the statutory interpretation of the Back Pay Act should resolve this case; however, even though the government did not raise the statutory issue, it specifically argued [5] that the award of such market-rate fees would violate canons of ethical conduct such as the prohibition against fee-splitting arrangements with non-lawyers and the prohibition against lawyers aiding in the unauthorized practice of law. In two of our prior cases, we agreed with the government's position that only a "hermetically sealed" litigation fund could meet these ethical requirements. In *Goodrich,* we held that a salaried union attorney is only entitled to attorney fees calculated at cost-plus-overhead under 5 U.S.C. § 7701(g)(1), even if the fees were deposited in a segregated legal representation fund controlled exclusively by attorneys for employee-related litigation. *See Goodrich,* 733 F.2d at 1580. We believed this separate fund would be insufficient to

---

5. We note that the dissenting opinion rejects the government's ethics argument out of hand, before proceeding to fashion its own statutory argument to rescue the government's case.

overcome the ethical barriers because such an arrangement would result in an indirect payment of funds to the union.[6] *See id.* We reasoned that "[b]y reducing the amount of its general funds the union is required to use to provide legal services, the payment to the fund of legal fees that exceed the union's of providing the services would result in the union's indirectly utilizing legal fees for its ordinary expenses." *Id.*

Similarly in *Devine*, we denied market-rate fees to union attorneys under section 2412(d)(2)(A) of the Equal Access to Justice Act because we feared that awarding market-rate fees would relieve the union of the burden of financing its litigation activities with its general funds, thereby effectively resulting in a fee-splitting arrangement. *See Devine*, 805 F.2d at 388–89. We noted that, because the litigation fund was not "fully supportive" of the union's litigation activities, the union would benefit indirectly from the award of market-rate fees and therefore we awarded only the costs of litigation. *See id.* at 389. In sum, the concern in these cases was that, even if a separate legal fund was established, ethical problems would remain because the union would merely be relieved from the burden of financing litigation activities through funds from general revenues and thus would benefit indirectly from an award of market-rate fees.[7]

Nowhere in its brief does the government argue the statutory interpretation now being posited by the dissent. Nor did

*Goodrich*, which according to the dissent "got it right," rely upon the dissent's rationale. A careful analysis of *Goodrich* shows that the *Goodrich* court's holding was premised specifically on the ethical restriction that payment of the market-rate fees would provide the union an indirect benefit. In distinguishing *Blum*, the court stated that the Legal Aid Society of New York received the entire fee whereas "[i]n the present case . . . . part of the fee would inure to the benefit of a nonlegal organization, the union, and it was for that reason that the Board limited the union's fees to its expenses of rendering the service." *Goodrich*, 733 F.2d at 1580.

Several of our sister circuits, however, have held that these ethical concerns do not require "hermetically sealed" or "fully supportive" litigation funds. These circuits have held that market-rate fees can be awarded to litigants who employ union staff counsel when all attorney fees are deposited into a separate fund controlled exclusively by lawyers and the fund is used to support litigation on behalf of employees' rights. *See Kean v. Stone*, 966 F.2d 119 (3d Cir.1992); *American Fed'n of Gov't Employees, AFL–CIO, Local 3882 v. Federal Labor Relations Auth.*, 944 F.2d 922 (D.C.Cir.1991); *Curran v. Department of Treasury*, 805 F.2d 1406 (9th Cir.1986).

We conclude today that there is a serious flaw with the reasoning set forth in our precedent and the government's position. According to *Devine*, *Goodrich*, and

---

**6.** The *Goodrich* opinion follows the reasoning outlined in *National Treasury Employees Union v. Department of Treasury*, 656 F.2d 848 (D.C.Cir.1981), which held that an attorney employed by a union could not receive legal fees in excess of the union's expenses despite the fact that the union had established a legal representation fund. The rationale of *National Treasury Employees Union* was subsequently rejected in *American Fed'n of Gov't Employees AFL–CIO Local 3882 v. Federal Labor Relations Auth.*, 944 F.2d 922 (D.C.Cir.1991).

**7.** The rationale in both *Goodrich* and *Devine* was based at least in part on the fact that claimant did not seek to protect rights of a constitutional nature. Specifically, in *Devine*

we noted that "different concerns exist when awarding attorney fees in civil rights cases where encouraging private attorney generals to come forth and challenge governmental abuses is undeniably an important concern." *Devine*, 805 F.2d at 388. However, personnel cases such as Mr. Raney's do involve the deprivation of a constitutionally protected right, namely a worker's property right in continued federal employment in the absence of due process of law. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Stone v. Federal Deposit Insur. Corp.*, 179 F.3d 1368, 1375 (Fed.Cir.1999).

the government, establishing a separate fund that is controlled solely by attorneys does not resolve the ethical concerns because money is fungible and attorney fees paid into a litigation fund may simply save the union from contributing to that fund in other ways. Under this reasoning, union attorneys therefore can recover only cost-based fees. If money is fungible, however, then awarding the union attorneys *any* fees will in fact simply save the union from contributing to the litigation fund. If it is acceptable to pay *some* fees, which in effect alleviates the LRF from obtaining some union funding, why is it is unacceptable to pay market-rate fees? In order to be consistent, our precedent and the government's reasoning must result in a complete prohibition on the payment of any fees to union attorneys. If unions are not allowed to benefit indirectly from legal fees then they should be barred from obtaining any benefits either from cost-based fees or from market-based fees. The restrictive analysis of our precedent is logically untenable.

We note that our sister circuits have discussed this inconsistency in the reasoning of our precedent. *See American Fed.*, 944 F.2d at 936 (explaining that if the union does "gain indirectly from market-rate fees, so also it [benefits] from fees that are cost-limited, and the ethical considerations are precisely the same. The size of the benefits varies ... but its character not one whit, and it defies logic to say that in one instance the benefit is ethically permissible but in the other it is not."); *Curran*, 805 F.2d at 1409–10 (pointing out an indirect benefit from market-rate fees also accrues to any contributor to a pro bono legal project receiving such an award, which includes "contributors to the Legal Aid Society of New York, to which

the Supreme Court approved an award of market-rate fees in *Blum* ");[8] *Kean*, 966 F.2d at 123 (explaining that "it is specious to reason that simply changing the amount a union will receive will resolve the 'ethical' dilemma").

The reasoning of our precedent, which we reject today, would mean that any prevailing market rates obtained by any non-profit legal organization affiliated with any public organization, such as the NAACP or the Sierra Club, would allow their respective organizations to obtain an indirect benefit by decreasing the amount which each organization would need to raise to continue their non-legal activities. Such concerns necessarily have been repeatedly rejected by the Supreme Court as well as our sister circuits. For example, in *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court allowed the NAACP Legal Defense and Educational Fund, Inc. to receive prevailing market-rates for its legal services. *See id.* at 284–85, 109 S.Ct. 2463. Similarly, in *Sierra Club v. Gorsuch*, 684 F.2d 972 (D.C.Cir.1982), the Sierra Club was awarded prevailing market rates for service rendered by its outside counsel. *See id.* at 975; *cf. National Wildlife Fed. v. Hanson*, 859 F.2d 313, 318 (4th Cir.1988) (awarding fees for services rendered by public interest law firm); *Environmental Defense Fund Inc. v. EPA*, 672 F.2d 42, 63–64 (D.C.Cir.1982) (awarding fees for work by outside counsel); *Oldham v. Ehrlich*, 617 F.2d 163, 169 (8th Cir.1980) (awarding fees for services provided by legal aid societies). In *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 517 F.2d 1141 (4th Cir.1975), the court rejected the contention that fees should be denied because they would be donated to the civil

---

8. It should also be noted that the Legal Aid Society of New York, which was the non-profit legal services organization for whom the Supreme Court in *Blum* allowed prevailing market rates, also performs limited legislative advocacy for its clients, consistent with its qualification under 26 U.S.C. § 501(c)(3) (1994). *See, e.g., Testimony of the Legal Aid Society Before the New York State Assembly Committee on Social Services March 3, 1999* (visited January 19, 2000) <http://www.legal-aid.org/testimon3_3.htm>, and the Supreme Court imposed no limitation that would preclude "subsidizing" non-legal activities of the organization.

rights organization that assisted the litigants in presenting their grievances instead of being paid to the lawyers. *Id.* at 1148.

In view of the Supreme Court's holding in *Blum* and the persuasive logic of the opinions from our sister circuits, we overturn our precedent in *Devine* and *Goodrich* to the extent that these decisions require union legal representation funds to be "hermetically sealed" or "fully supportive" of the union's litigation activities. Rather, when a legal fund is separated from other union funds and is controlled exclusively by attorneys for the sole benefit of employee litigation, such segregation eliminates ethical barriers to market rate calculation for attorney fee awards. Whether the fund is "hermetically sealed" or "fully supportive" of the union's litigation activities is simply irrelevant. Squaring our precedent with every other court in the land that has considered this issue, we thus agree with the court in *Kean* that "[a]llowing a union to benefit indirectly from the proceeds of law practice no more violates ethical rules than allowing a union to maintain lawyers to represent its members...." *Kean,* 966 F.2d at 123.

In this case, there is no reason to assume that non-lawyer union officials exercised control over union attorneys. When fees are paid into a separate account used solely by lawyers for employee litigation purposes, we discern no unethical fee splitting with a lay entity and no encouragement of the unauthorized practice of law. We perceive no realistic threat that depositing fees in the LRF will encourage the unauthorized practice of law or result in the interference with the professional judgment of union attorneys. As our sister circuit put it in *Kean,* "[t]he fear that the benefit may amount to unauthorized practice of law or compromise an attorney's independent judgment or constitute splitting fees with laypersons is *highly speculative.*" *Id.* (emphasis added). The union's influence, while theoretically possible, is hardly a real danger here. We

therefore hold there is no ethical barrier to compensation of Mr. Raney's attorneys at the market rate. The decision of the arbitrator denying market-rate fees is therefore vacated and the matter is remanded for the entry of a market-rate fee award in accordance with this opinion for services rendered during Mr. Raney's grievance proceedings.

The Supreme Court specified in *Blum* that something more than an attorney's own affidavit is required to establish the prevailing market rate for attorney's fees:

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 895 n. 11, 104 S.Ct. 1541. Various appellate courts that have addressed *Blum*'s "satisfactory evidence" requirement have demanded more than the affidavits presented here by Hobbie and Schrier. *See Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 556 (7th Cir.1999) (citing *Blum* and stating that "[a]n attorney's self-serving affidavit alone cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services."); *Washington v. Philadelphia County Court,* 89 F.3d 1031, 1035–36 (3d Cir.1996); *Bordanaro v. McLeod,* 871 F.2d 1151, 1168–69 (1st Cir.1989).

■ Because the government in this case did not contest the affidavits and the court accepted them as reasonable, we do not disturb the findings below. However, in future cases, the trial court should demand adequate proof from individuals familiar with the market of the community billing rate charged by attorneys of equivalent skill and experience performing services of similar complexity.

### D. Overtime Pay

We now turn to the issue of overtime compensation. Mr. Raney argues that the Back Pay Act mandates an award of overtime pay as part of the overall relief. The government, while agreeing that overtime pay may be a component of a back pay award, argues that the burden of establishing entitlement to overtime is on the petitioner. The government contends that the arbitrator was correct in determining that Mr. Raney failed to show that he would have worked overtime hours. Thus, the government maintains that the arbitrator did not abuse his discretion in rejecting Mr. Raney's request for overtime pay.

The Back Pay Act entitles an employee, on correction of the personnel action, to receive for the period that the personnel action was in effect, an amount equal to all or any part of the pay, allowance, or differentials, as applicable that the employee normally would have earned or received during the period if the personnel action had not occurred. *See* 5 U.S.C. § 5596(b)(1)(A)(i) (1994). The trier of fact must determine what, if any, of the items enumerated in section 5596(b)(1)(A)(i) the employee would normally have earned or received. If there is no evidence that an employee would have normally received or earned some component of back pay, then the employee is not entitled to receive an award for that component. *See White v. United States Postal Serv.*, 931 F.2d 1540, 1542 (Fed.Cir.1991).

In his supplementary opinion, the arbitrator found that Mr. Raney had failed to carry his burden of proof as to the overtime hours he might have worked. The arbitrator considered Mr. Raney's affidavit, but did not find it to be credible, stating that more detailed time records would be necessary to substantiate the overtime claim. Credibility determinations are within the discretion of the arbitrator and are virtually unreviewable on appeal. *See Rogers v. Department of De-fense Dependents Schools, Germany Region*, 814 F.2d 1549, 1553–54 (Fed.Cir. 1987). The arbitrator considered the elements of back pay that Mr. Raney would normally receive and concluded based on the record, including the rejection of Mr. Raney's affidavit, that overtime pay should not be awarded. We conclude there is substantial evidence to support the arbitrator's finding and therefore must affirm the denial of overtime pay.

## CONCLUSION

For the reasons set forth in this opinion, we vacate the arbitrator's decision denying market-rate fees for work completed by Mr. Raney's attorneys and remand for the entry of market-rate fees. With respect to the overtime pay issue, we affirm the denial of such pay by the arbitrator.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*

RADER, Circuit Judge, concurring-in-part, and dissenting-in-part.

This court's opinion today applies the "reasonable attorney fees" language of the Back Pay Act to achieve an unreasonable result. Or rather, this court does not in reality apply the "reasonable attorney fees related to the personnel action" language of the Back Pay Act, which requires a far different result. Relying on the Civil Rights Act instead of the different standards set by the Back Pay Act, this court permits a not-for-profit union to collect attorney fees at prevailing market rates charged by profit-making private attorneys, although the actual cost of the legal services was substantially less than the amount recovered.

Because ethical rules do not bar the recovery of fees, I concur in part. However, I must respectfully dissent in part because the Back Pay Act does not allow this court to award fees to non-profit legal organizations at the rates for profit-making private law firms.

## I.

Without cause, the United States Bureau of Prisons placed Larry Raney on home duty. He challenged the disciplinary action in an arbitration proceeding under his union's collective bargaining agreement with the Bureau. The arbitrator's original decision ordered reinstatement of Mr. Raney with back pay, but denied his request for attorney fees and overtime pay. On Mr. Raney's motion to reconsider the denials of attorney fees and overtime pay, the arbitrator rendered a supplemental decision. That decision reviewed the statutory basis for awarding attorney fees under the Back Pay Act, *see* 5 U.S.C. §§ 5596(b)(1)(A)(ii) and 7701(g) (1994), and awarded Mr. Raney attorney fees based on the American Federation of Government Employees' cost of providing representation to Mr. Raney. The arbitrator also reviewed Mr. Raney's request for overtime pay and again declined that request. This court now reviews those decisions *en banc.*

## II.

In the first place, the Government contends that payment of "reasonable attorney fees" raises ethical concerns. This court correctly dismisses that contention. After all, the Back Pay Act expressly authorizes payment of an attorney fee to an eligible prevailing party. Because unions and other non-profit legal organizations qualify for fee-shifting, the Act itself has answered any ethical concerns. As this court correctly reasons, with the payment of the first dollar to a non-profit entity, the ethical obstacle to further payments vanish. Theoretical ethical concerns do not multiply with the amount of a payment but instead would vest with the payment of a single dollar. Because the Back Pay Act permits payments to non-profit entities, *see* 5 U.S.C. 5596(b)(1)(A)(ii), the Act itself acknowledges no ethical obstacle to a non-profit entity at a total cost to that entity substantially lower than market rates for profit-making private attorneys qualifying for fees. This court correctly disposed of the Government's ethical argument.

## III.

Disposing of the ethical argument, however, does not answer the fundamental question in this case: what is a "reasonable attorney fee related to the personnel action ... in accordance with the standards established under 7701(g)" when the service provider works for a non-profit entity? The Back Pay Act authorizes a "reasonable attorney fee related to the personnel action ... in accordance with the standards [of] 7701(g)." 5 U.S.C. § 5596(b). This court does not directly address that language or its implications, but instead concludes by reference to *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), that 42 U.S.C. § 1988 governs the meaning of the different language in the Back Pay Act. By expressly tying the words "reasonable attorney fee" to the qualifying phrases "related to the personnel action" and "in accordance with ... 7701(g)," the Back Pay Act envisions a different fee-shifting scheme than the Supreme Court addressed in *Blum* under the Civil Rights Act.

The Back Pay Act expressly ties "reasonable attorney fees related to personnel action[s]" to the "standards ... under 7701(g)." Section 7701(g), in turn, authorizes the adjudicator of the employee's case to "require payment by the agency involved of reasonable attorney fees *incurred by an employee or applicant.*" 5 U.S.C. § 7701(g)(1) (emphasis added). This language means what it says. The Act specifies that the fees awarded must be the fees actually incurred by the employee, the fees actually billed rather than some speculative or punitive award.[9]

9. Obviously the strictest reading of the "incurred" language of the statute would preclude any attorney fee award for the union because Mr. Raney "incurred" no actual attorney fees. However, to reach the majority's conclusion reads "incurred" out of the statute entirely. Therefore, I conclude that "in-

Thus, for instance, if Mr. Raney had settled his claim quickly instead of arbitrating over a period of years, he could only recover for the amount of time his attorneys actually spent on his case. Similarly, if Mr. Raney had retained a junior solo practitioner who charged him fifty dollars per hour, he could not claim an award of attorney fees of five hundred dollars per hour that might have been charged by a senior partner in a private law firm. Thus, Mr. Raney, under the standards of § 7701(g), which bind this case, cannot receive an award commensurate with the amount charged by attorneys in private practice unless his union lawyers caused him to incur that liability. To find otherwise ignores the reality of the markets for legal services and reads the word "incurred" out of the governing statute.

The standards of § 7701(g) have still more to say about the meaning of "reasonable attorney fees related to ... personnel action[s]" under the Back Pay Act. The second paragraph of § 7701(g) highlights this court's error in relying on the Civil Rights Act and *Blum* to support its result. That second paragraph requires courts to use the standards set forth in the Civil Rights Act to compute attorney fees when a Back Pay Act "decision is based on a finding of discrimination." 5 U.S.C. § 7701(g)(2). Thus, § 7701(g) sets forth two separate rules to govern the computation of attorney fees—one for cases involving illegal discrimination, and another for all other personnel cases.

Mr. Raney's case does not involve illegal discrimination. Therefore, it is not governed by the second paragraph of § 7701(g) and the standards of the Civil Rights Act. Inexplicably, this court ignores § 7701(g) and applies the Civil Rights Act and *Blum* (a Civil Rights Act case) to Mr. Raney's case. Without reference to § 7701(g), this court stretches the *Blum* approach and Civil Rights Act standards to govern attorney fees in Back Pay Act cases, thus nullifying § 7701(g)(2) and frustrating the Act's instruction to apply a different standard—that prescribed in the Civil Rights Act—only for Back Pay Act cases involving illegal discrimination cases.

The majority reads *Blum* to provide "crystal clear" instructions entitling nonprofit legal services organizations to the rates charged by private law firms. However, for some of the reasons mentioned above, this court has previously explained that *Blum* "is inapposite." *See Goodrich v. Department of Navy*, 733 F.2d 1578, 1580 (Fed.Cir.1984). In *Goodrich*, this court distinguished *Blum* on the ground that a union is different from the nonprofit law office at issue in *Blum*, and because *Blum* interpreted a different statutory scheme with entirely different underpinnings. The *Goodrich* court explained:

> A major reason for awarding attorney's fees in [civil rights] cases is to encourage and facilitate the bringing of suit[s] to protect and vindicate those rights. *Cf. Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). There is a no comparable public policy to encourage the bringing of suit by federal employees challenging adverse personnel actions against them.

*Goodrich* 733 F.2d at 1580–81.

As § 7701(g) makes abundantly clear, the *Goodrich* court got it right. The Supreme Court's instructions in *Blum* are inapplicable to Mr. Raney's case. The very first sentence of Justice Powell's opinion in *Blum* explains that "[t]itle 42 U.S.C. § 1988 provides that *in federal civil rights actions* 'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'" *Blum*, 465 U.S. at 888, 104 S.Ct. 1541 (emphasis added). Thus, the Supreme Court may have announced a crystal clear rule in relation to federal civil rights actions, but said nothing of stretching their jurisprudence to apply to all attorney fee statutes, partic-

curred" must be taken to mean incurred by, or on behalf of, an employee.

ularly those with distinctly different statutory language. In particular, 42 U.S.C. § 1988 contains no mention of the "incurred by an employee" language in the Back Pay Act.

The Supreme Court's analysis in *Blum* also relies heavily upon the legislative history of § 1988. The legislative history of the Civil Rights Act simply cannot reach to embrace interpretation of the Back Pay Act, except as expressly incorporated by § 7701(g)(2). The Supreme Court has repeatedly clarified that civil rights cases require higher levels of legal scrutiny because of the important and compelling interests concerned. Perhaps to prevent devaluation of civil rights currency by overuse, the Back Pay Act expressly specified a different standard.

The legislative history excerpted in footnote 7 of *Blum* also relies on four cases, all involving attorneys in private practice and not those employed by a union. The cited legislative history analyzes those four cases and notes that they "do not produce windfalls to attorneys." *Blum*, 465 U.S. at 893 n. 7, 104 S.Ct. 1541. Thus, the senators that authored the legislative history indicated that the market-based fees approach does not produce windfalls when applied to private practice attorneys—hardly a surprising conclusion. However, that legislative history also indicates that those senators sought to prevent windfalls in fee awards.

### IV.

Before today's result, this court interpreted "reasonable attorney fees" in the context of the Back Pay Act to mean fully loaded costs of providing the representation when computing attorney fee awards for services supplied by unions. This standard reflects more accurately the statutory standard for "reasonable attorney fees related to personnel actions" governed by the Back Pay Act. Although the Supreme Court in *Blum* rejected the argument for cost-based fees in the context of the Civil Rights Act, the Back Pay Act's different

language and standards support the wisdom of this court's established practice of using market principles to shift fees.

Without belaboring the economics, it is clear that costs and fees of a non-profit union legal office differ drastically from the costs and fees of a profit-making private law firm in terms of fixed costs, variable costs, and profit. For example, union law practices do not have the same client expectations for office space and equipment, do not compete for the same pool of entering attorneys at the same pay rates, do not impose the same billing requirements on new attorneys, and do not bill their clients with the same profit making agenda. Thus, the employee in a personnel action "incurs" a different liability than a client negotiating to hire the services of a "blue chip" law firm. A reasonable attorney fee related to a personnel action incurred by the employee who uses union attorneys is thus very different from the prevailing market rate fee at private law firms. This court's analysis does not convince otherwise. The purpose of the Back Pay Act's fee-shifting statute is to make an aggrieved federal employee whole, not to require the federal employer to pay a larger amount than what was actually incurred, even assuming that the larger amounts are used to subsidize other legal activities rather than for general union purposes.

In sum, I agree with the majority's well reasoned approach to the ethical issues asserted by the Government. However, because I believe that this court's rule in *Goodrich* remains justified by the language of the Back Pay Act, I would affirm.