NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-3290

JOSEPH V. ARRIETA,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Morris E. Fischer, Law Office of Morris E. Fischer, of Bethesda, Maryland, for petitioner.

Maame A.F. Ewusi-Mensah, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With her on the brief were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director. Of counsel on the brief was Frances Silva Ross, Associate Legal Advisor, Office of the Principal Legal Advisor, Immigration and Customs Enforcement, Department of Homeland Security, of Washington, DC.

Appealed from; Arbitrator's Decision

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-3290

JOSEPH V. ARRIETA,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Petition for review of an arbitrator's decision
by John M. Donoghue.

_____

DECIDED: July 7, 2009

_____

Before MICHEL, <u>Chief Judge</u>, LINN, <u>Circuit Judge</u>, and ST. EVE,<sup>*</sup> <u>District Judge</u>.

ST. EVE, <u>District Judge</u>.

Petitioner Joseph V. Arrieta challenges an arbitrator's final decision that affirmed

his removal from the position of Deportation Officer by Respondent Department of

---

<sup>*</sup>    The Honorable Amy J. St. Eve, District Judge, United States District Court
for the Northern District of Illinois, sitting by designation.

Homeland Security, Immigration and Customs Enforcement (the "Agency"). Because the arbitrator's decision is supported by substantial evidence, we affirm.

## I. BACKGROUND

Mr. Arrieta commenced working for the Agency, then the Immigration and Naturalization Service, in 1991. Until his removal from service, effective December 7, 2007, he served in various Law Enforcement Officer ("LEO") positions, including that of a Supervisory Immigration Enforcement Agent ("SIEA"), and beginning in 2006, a Deportation Officer.

On May 29, 2005, police officers from the Fairfax County, Virginia Police Department ("FCPD") responded to the scene of a machete attack that occurred at a home adjacent to the home of Mr. Arrieta's girlfriend, Gloria Rodriguez. The FCPD suspected the involvement of Gloria Rodriguez's son, Cesar Rodriguez, who was known by the FCPD to be a member of one of Northern Virginia's largest gangs, MS-13. When FCPD Officer Albert Cruz arrived at the Rodriguez home in search of Cesar Rodriguez, Officer Cruz found Mr. Arrieta, who identified himself as a federal LEO and told Officer Cruz that he was armed. Officer Cruz told Mr. Arrieta of the machete attack at the home next door and asked to speak with Mr. Rodriguez. Mr. Arrieta told Officer Cruz that Mr. Rodriguez had left with his mother and was not at home.

Mr. Arrieta's subsequent sworn statement reveals that although he did not witness the machete attack, he had been inside the Rodriguez home when the machete attack occurred and had heard a faint scream in the distance. Mr. Arrieta further stated that a "couple" of minutes after he heard the scream, Mr. Rodriguez knocked on his mother's bedroom door and asked Ms. Rodriguez to step outside the room. The two

subsequently left. Sometime later, Officer Cruz arrived at the home and spoke to Mr. Arrieta. Mr. Arrieta did not tell Officer Cruz about the faint scream, however, or provide any additional information.

Shortly thereafter, Ms. Rodriguez returned home, and Mr. Arrieta informed her that the police were looking for her son. According to Mr. Arrieta's sworn statement, Officer Cruz "gave us his business card and told us to tell Cesar to call him as soon as possible." Mr. Arrieta and Ms. Rodriguez were standing together at the time, but Mr. Arrieta later testified at the arbitration hearing, in conflict with his previous statement, that Officer Cruz spoke directly to Ms. Rodriguez and not to Mr. Arrieta. When Mr. Rodriguez returned home later that evening, Mr. Arrieta and Ms. Rodriguez gave him Officer Cruz's business card and told him to call Officer Cruz. Mr. Arrieta testified that Mr. Rodriguez went into another room to make the call but when he tried, no one answered the phone. Mr. Arrieta, however, made no effort to contact Officer Cruz to notify him of Mr. Rodriguez's return.

A few days later, on June 2, 2005, the FCPD executed a search warrant at the Rodriguez home. When the FCPD arrived, an unmarked police car assigned to Mr. Arrieta was parked in the driveway of the home, but no one was home. As FCPD performed the search, Mr. Arrieta and Ms. Rodriguez both returned to the home. Mr. Arrieta translated into Spanish as the FCPD questioned Ms. Rodriguez on the whereabouts of her son. Although Ms. Rodriguez was evasive at first, Mr. Arrieta encouraged her to reveal the location of the company where Mr. Rodriguez worked. The FCPD arrested Mr. Rodriguez later that day. Mr. Rodriguez was subsequently convicted and sentenced to six years in prison for charges related to his gang activities.

While still at the Rodriguez household on June 2, 2005, one of the FCPD officers, an experienced member of the Northern Virginia Gang Task Force, expressed his concern to Mr. Arrieta at seeing an Agency LEO, who had access to gang files, at Mr. Rodriguez's home. The next day, the FCPD reported the incident to the Agency. The Agency's Office of the Inspector General ("OIG") opened an investigation that included, among other things, placing a GPS tag on Mr. Arrieta's car. Contrary to Mr. Arrieta's claim that he visited the Rodriguez home only a few times, the GPS tag revealed that Mr. Arrieta visited the Rodriguez home no fewer than twenty times in the three to four months following the start of the investigation.

The OIG investigation concluded that Mr. Arrieta had engaged in misconduct. Specifically, the Agency charged Mr. Arrieta with: (1) conduct unbecoming a LEO; (2) inappropriate association with an individual suspected of criminal conduct; (3) lack of candor; (4) unauthorized disclosure of sensitive government information; and (5) use of an immigration database for other than official purposes. The events of May 29, 2005 and June 2, 2005 gave rise to the first charge—the Agency found that Mr. Arrieta failed to contact the FCPD upon Mr. Rodriguez's return home on May 29 and that Mr. Arrieta exercised poor judgment in failing to notify his Agency supervisors of his interaction with the FCPD on both days.[1]

---

[1] The Agency's Guidance to Offenses and Penalties prohibits, among other things, Paragraph H(9), "[k]nowingly and inappropriately associating with…persons connected with criminal activities"; Paragraph F(1), "failing to provide honest and complete information or displaying [a] lack of candor in any official inquiry or proceeding"; and Paragraph H(6), "using government property…for other than official purposes," which includes "querying confidential or sensitive databases for other than official purposes." The Agency's proposal to remove Mr. Arrieta also references Paragraph H(31) as prohibiting the unauthorized disclosure of sensitive government information, but H(31) is not included in the table provided in the joint appendix.

The remaining charges arise from facts uncovered during the Agency's subsequent investigation. As to the second charge—inappropriate association with an individual suspected of criminal conduct—the Agency found that Mr. Arrieta continued to associate with Mr. Rodriguez, including driving Ms. Rodriguez to visit him in prison and, at one point, offering words of encouragement during a phone conversation. Mr. Arrieta also admitted that he delivered a payment to Mr. Rodriguez's attorney because the attorney's office was close to his own. As to the fourth charge, unauthorized disclosure, Mr. Arrieta admitted discussing certain Agency operations, including upcoming MS-13 raids, with Ms. Rodriguez. Mr. Arrieta's conflicting statements regarding what he discussed with Ms. Rodriguez formed the basis for the third charge— lack of candor. Finally, Mr. Arrieta admitted to the fifth charge, specifically that he queried Ms. Rodriguez's record in the Agency's Central Index System ("CIS") for other than official purposes.

The arbitrator concluded that the Agency's removal was justified as to each of the charges, and this appeal followed.

## II.    DISCUSSION

This court's review of an arbitrator's decision is narrow. The court reviews the arbitrator's decision under the same standard that applies to a decision of the Merit Systems Protection Board. Giove v. Dep't of Transp., 230 F.3d 1333, 1338 (Fed. Cir.

Regardless, the Agency's introduction specifically notes that the guide "does not cover the entire range of possible offenses…[and] [o]ffenses not covered in the guide can be separately identified and may become a basis for disciplinary or adverse action." In addition, the accompanying memorandum states that the guide "provides guidance" and that "[a]s members of a federal law enforcement agency and the Department of Homeland Security, we have a special responsibility to demonstrate the highest level of integrity to the public that we serve and protect on a daily basis."

2000); see also James v. Dale, 355 F.3d 1375, 1378 (Fed. Cir. 2004). Consequently, the court must affirm an arbitrator's decision unless it is: (1) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedure required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000); James, 355 F.3d at 1378–79; Giove, 230 F.3d at 1338; Hayes v. Dep't of Navy, 727 F.2d 1535, 1537 (Fed. Cir. 1984). Substantial evidence means such "relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion even though other reasonable persons might disagree,'" and is "'a lower standard of proof than preponderance of the evidence.'" Giove, 230 F.3d at 1338 (quoting 5 C.F.R. § 1201.56(c)(1)).

An agency may remove an employee only "for such cause as will promote the efficiency of the service." James, 355 F.3d at 1378 (quoting 5 U.S.C. § 7513(a) (2000)). To support its decision to discharge an employee, an agency must establish by preponderance of the evidence (1) that misconduct occurred; (2) that a nexus exists between the misconduct and the efficiency of the service; and (3) that the agency imposed a reasonable penalty. James, 355 F.3d at 1378–79; Brown v. Dep't of Navy, 229 F.3d 1356, 1358 (Fed. Cir. 2000); Lachance v. Devall, 178 F.3d 1246, 1251 (Fed. Cir. 1999).

Mr. Arrieta has never disputed that he committed the offense described in charge 5—accessing the Agency's CIS database to query Ms. Rodriguez's immigration status. Instead, he contends that the punishment for this infraction was too harsh and that the remaining charges were not supported by substantial evidence. In addition, he argues

that the arbitrator ignored the significance of Mr. Arrieta's promotion during the pending investigation, failed to analyze the reasonableness of the Agency's penalty, and failed to consider appropriate mitigating factors.

As an initial matter, Mr. Arrieta challenges a number of the arbitrator's findings based on the arbitrator's choice to credit the statements of other witnesses—or Mr. Arrieta's past statements—over his arbitration testimony. Such "[c]redibility determinations are within the discretion of the arbitrator," however, and "are virtually unreviewable on appeal." Raney v. Fed. Bureau of Prisons, 222 F.3d 927, 939 (Fed. Cir. 2000) (en banc) (citing Rogers v. Dep't of Def. Dependents Sch., Germany Region, 814 F.2d 1549, 1553–54 (Fed. Cir. 1987)). It is not for us to second-guess the arbitrator's assessment of the evidence. Hayes, 727 F.2d at 1537. Accordingly, the arbitrator was entitled to credit the testimony of investigating agents—or even Mr. Arrieta's past sworn statements—over Mr. Arrieta's hearing testimony.

Mr. Arrieta also argues that his "casual" association with Mr. Rodriguez does not provide a basis for termination. The arbitrator, however, did not find credible Mr. Arrieta's testimony that he did not know of Mr. Rodriguez's gang affiliation. Instead, the arbitrator found that Mr. Arrieta knew of the gang affiliation as early as the May 29, 2005 incident, when Officer Cruz questioned him. After that date, the relationship went beyond mere association: "The relationship continued after D.O. Arrieta became aware that [Mr. Rodriguez] was subject to very serious criminal charges" and included visiting Mr. Rodriguez and even delivering a fee payment to his attorney. As Mr. Arrieta conceded, law enforcement officers are held to higher standards than other public employees, and the arbitrator found that Mr. Arrieta's behavior fell short of this standard:

the essence of his job is law enforcement. He is a trained officer who has worked MS-13 cases. And while doing so, Mr. Arrieta has, in his private life, socially associated with at least one MS-13 gang member. When the two aspects of his life intersected, he chose loyalty to his social ties to the detriment of the efficiency of his law enforcement service. The nexus is clear, unmistakable and obvious to any reader of the facts.

The arbitrator also rejected Mr. Arrieta's claims that he had no obligation to call Officer Cruz with Mr. Rodriguez's whereabouts or even to inform his Agency supervisors of the incident. In particular, the arbitrator found this argument to conflict with the policy goals of the agency:

> his own testimony reveals that D.O. Arrieta had no intention of being candid and direct with his supervisors. To the contrary, he maintains that unless regulations specifically require him to make reports in a certain way, or to certain people, he will persist in having no obligation to do so… [But] [t]he supervisors under which he works are entitled to full and candid disclosure of D.O. Arrieta's observations while at work and his judgment of what those observations mean.

The arbitrator thus stated a rational basis for his decision, grounded in substantial evidence—namely, Mr. Arrieta's own testimony.

Mr. Arrieta also contends that the arbitrator failed to give due consideration of the factors enumerated in Douglas v. Veteran's Admin., 5 MSPB 313, 5 M.S.P.R. 280 (MSPB 1981), when reviewing the Agency's penalty. This court, however, does not require an arbitrator to consider each and every one of the 12 Douglas factors "mechanistically by [a] preordained formula.'" Farrell v. Dep't of Interior, 314 F.3d 584, 593–94 (Fed. Cir. 2002) (quoting Webster v. Dep't of Army, 911 F.2d 679, 686 (Fed. Cir. 1990)). Although the arbitrator in this case did not organize his analysis by Douglas factors, it is clear that the arbitrator considered and applied these factors. The arbitrator found that Mr. Arrieta's offenses went to the "essence of his job," and that the violations

were serious enough to call into doubt whether Mr. Arrieta could "work within the Agency and testify for the U.S. Attorney" as his job required. The arbitrator essentially found that Mr. Arrieta's violations undermined the Agency's confidence in his ability to exercise sound judgment. Such concerns outweigh Mr. Arrieta's history of service, especially given Mr. Arrieta's law enforcement position. The arbitrator's discussion of the Douglas factors was sufficient.

Mr. Arrieta also urges that the arbitrator erred by failing to sufficiently consider mitigating factors. Mr. Arrieta, for example, points out that the Agency promoted him to Deportation Officer during the pendency of the investigation. The arbitrator considered this promotion and noted that the promotion was an "unexplained lapse," but did not "constitute a waiver of its right to discipline" Mr. Arrieta for his inappropriate conduct. Given that the OIG investigation did not conclude until well after Mr. Arrieta's promotion, this view does not constitute an arbitrary or capricious determination.

Mr. Arrieta also relies on the range of penalties in the Agency's Guide to Offenses and Penalties to argue that removal was too harsh a punishment. The Agency, however, did not exceed the range of penalties listed in its table. For each charge against Mr. Arrieta, the guide provides removal as a possible penalty for either a second or third offense, and the lack of candor charge alone could warrant removal for even a single offense. Given that the multiple charges against Mr. Arrieta represented multiple offenses, and given that the Agency found its confidence in Mr. Arrieta's judgment to be compromised, the Agency had a supportable basis for exceeding the guide's proposed penalties. Regardless, the guide specifically provides that it "does not cover the entire range of possible offenses…[and] [o]ffenses not covered in the guide

can be separately identified and may become a basis for disciplinary or adverse action." The court's review of penalties imposed by agencies "is highly deferential, and requires a showing that the penalty is grossly disproportionate to the offense charged." <u>Farrell</u>, 314 F.3d at 593–94; (quoting <u>Bieber v. Dep't of Army</u>, 287 F.3d 1358, 1365 (Fed. Cir. 2002)). Under this deferential standard, and in light of the substantial evidence of misconduct, Mr. Arrieta has failed to show that removal was grossly disproportionate to the offenses charged.

### III.   CONCLUSION

For the reasons stated above, the court affirms the arbitrator's decision.

### COSTS

No costs.